336 Conn. 545 MAY, 2021 545

In re Ava W.

IN RE AVA W.*
(SC 20465)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.**

*Syllabus*

The respondent mother appealed from the order of the trial court denying
a request for visitation with her minor child subsequent to the court's
termination of her parental rights with respect to that child. The court
had terminated the respondent's parental rights pursuant to statute
(§ 17a-112), finding that she had abandoned the child, that she had failed
to achieve a degree of personal rehabilitation such that she could resume
a responsible position in the child's life, and that termination was in
the best interest of the child. During the termination proceedings, the
child's counsel had requested that the court consider issuing an order
of posttermination or postadoption visitation between the child and the
respondent, who agreed with that request. The court denied the request
for visitation, concluding, inter alia, that it lacked the authority to evalu-
ate whether posttermination visitation would be necessary or appro-
priate to secure the welfare, protection, proper care and suitable support
of the child in accordance with the statute (§ 46b-121 (b) (1)) affording
courts certain authority in juvenile matters. On appeal from the trial
court's order denying the request for posttermination visitation, the
respondent claimed, inter alia, that the trial court incorrectly concluded
that it lacked authority to order posttermination visitation. The peti-
tioner, the Commissioner of Children and Families, claimed on appeal
that this court lacked subject matter jurisdiction and that the appeal
should therefore be dismissed. The petitioner specifically asserted that
the respondent was not aggrieved by the trial court's order, that the
visitation issue became moot when the court terminated the respon-
dent's parental rights, and that the respondent lacked standing to appeal
because she failed to appeal from or seek or obtain a stay of the judgment
terminating her parental rights. *Held*:

1. The respondent was aggrieved by the trial court's order denying the
   request for posttermination visitation: the respondent had a specific
   personal and legal interest in the subject matter of the decision, as she

* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the Appellate Court.

** The listing of justices reflects their seniority status on this court as of
the date of oral argument.

In re Ava W.

was a party to the underlying litigation who had requested that the court act pursuant to its common-law authority; moreover, the respondent suffered an injury as a result of the court's decision, and the court's termination of her parental rights did not eliminate the potential harm of being denied posttermination visitation with the child.

2. The petitioner could not prevail on her claim that the issue of posttermination visitation was rendered moot by virtue of the trial court's termination of the respondent's parental rights, as a live controversy existed between the petitioner and the respondent as to whether the trial court lacked authority to order posttermination visitation, the interests of the parties were adverse, this court was capable of adjudicating whether the trial court had authority to order posttermination visitation, and a determination regarding the issue could result in practical relief for the respondent; moreover, no intervening circumstance had arisen during the pendency of the appeal that resolved the issue of posttermination visitation or rendered it insignificant.

3. The respondent did not lack standing to appeal from the trial court's posttermination visitation order on the ground that she did not appeal from or seek or obtain a stay of the judgment terminating her parental rights: the respondent was not required to seek or obtain a stay of the termination judgment because she did not seek to delay enforcement of that judgment, and requiring her to seek or obtain such a stay would serve no purpose, as her acceptance of the trial court's determination that termination was in the child's best interest did not foreclose the possibility that posttermination visitation might potentially be appropriate to secure the child's welfare, protection, proper care and suitable support; moreover, requiring the respondent to seek a stay would encourage further litigation, waste judicial resources, and thwart the goal of ensuring the welfare of the child, and the controversy centered exclusively on whether the trial court had the authority to order posttermination visitation between the respondent and the child.

4. The trial court incorrectly concluded that it lacked the authority to order posttermination visitation: the trial court had the authority under § 46b-121 (b) (1) to issue a posttermination visitation order, as long as it found such visitation necessary or appropriate to secure the child's welfare, the scope of the statute extended to adults who owed some legal duty to the child and was not limited to biological parents, the statute did not expressly abrogate the court's authority to regulate visitation, and case law and the statute's lack of limiting language supported the court's authority to issue an order of posttermination visitation; moreover § 17-112a (b) through (h), which the trial court relied on to deny posttermination visitation, and which was intended by the legislature to accomplish cooperative postadoption agreements between genetic parents and intended adoptive parents, did not abrogate or limit the trial court's common-law authority, as codified in § 46b-121 (b) (1), to order posttermination visitation, as § 17a-112 (b) through (h) applied to only a narrow

In re Ava W.

subset of termination proceedings, rather than the wide range of termination circumstances that included those in the present case.

5. The petitioner could not prevail on her claim that the trial court's denial of posttermination visitation should be upheld on the alternative ground that the court correctly determined that such visitation would not be in the child's best interest, as the trial court, having believed that it lacked authority to order visitation, declined to consider whether visitation would be necessary or appropriate to secure the welfare, protection, proper care and suitable support for the child in accordance with § 46b-121 (b) (1); accordingly, the trial court's order denying the request for visitation was reversed and the case was remanded for a dispositional hearing at which the trial court is to consider the merits of ordering visitation.

(*One justice concurring separately*)

Argued May 4—officially released August 10, 2020***

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, and tried to the court, *C. Taylor, J.*; judgment terminating the respondents' parental rights; thereafter, the court denied the request by the minor child and the respondent mother for posttermination visitation between the minor child and the respondent mother, and the respondent mother appealed. *Reversed*; *further proceedings*.

*Albert J. Oneto IV*, assigned counsel, with whom, on the brief, was *Stacy L. Schleif*, assigned counsel, for the appellant (respondent mother).

*Evan O'Roark*, assistant attorney general, with whom were *Benjamin Zivyon*, assistant attorney general, and, on the brief, *William Tong*, attorney general, for the appellee (petitioner).

*** August 10, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

In re Ava W.

*Opinion*

D'AURIA, J. In this certified appeal, we must decide whether a trial court has the legal authority to order post-termination visitation between a parent and the parent's minor child at the time the court considers termination of parental rights pursuant to General Statutes § 17a-112 (j). The respondent, Kiarah P., challenges the trial court's determination that it lacked authority to order visitation between her and her minor daughter, Ava W., upon ordering termination of the respondent's parental rights.[1] The respondent claims that the trial court should have considered her request for posttermination visitation under its broad authority to enter "any order," pursuant to General Statutes § 46b-121 (b) (1), so long as the order serves the best interest of the child.

In response, the petitioner, the Commissioner of Children and Families, makes three arguments: (1) the respondent lacks standing to challenge the trial court's order regarding visitation because the court terminated her parental rights; (2) the trial court correctly determined that, as a matter of law, it lacked the authority to issue an order for posttermination contact; and (3) even if the trial court had the authority to order posttermination visitation, it correctly determined that posttermination visitation would not be in the child's best interest.

We agree with the respondent that the jurisdictional hurdles of aggrievement and mootness have been satisfied and do not defeat this court's subject matter jurisdiction to adjudicate this appeal. We also agree with the respondent that a trial court has authority to issue a posttermination visitation order that is requested within the context of a termination proceeding, so long as it

---

[1] Counsel for the minor child supports the respondent's appeal and has joined the respondent's brief. The trial court also terminated the parental rights of the respondent father. Because the father has not appealed, we refer in this opinion to the respondent mother as the respondent.

is necessary or appropriate to secure the welfare, protection, proper care and suitable support of the child. That authority derives from the court's broad common-law authority over juvenile matters and the legislature's enactment of § 46b-121 (b) (1) codifying that authority. The trial court in the present case incorrectly determined that it lacked authority to consider a posttermination visitation order on the basis of the respondent's failure to satisfy the statutory requirements of § 17a-112 (b) through (h). Section 17a-112 (b) governs "cooperative postadoption agreement[s]" under which parents voluntarily relinquish their parental rights and intended adoptive parents willingly enter into a postadoption contact agreement. The present case does not fall within that category of circumstances, and the respondent's failure to satisfy those requirements did not deprive the trial court of authority to consider posttermination visitation pursuant to its broad authority under § 46b-121 (b) (1). Therefore, the trial court incorrectly determined that it lacked authority to evaluate whether posttermination visitation would be necessary or appropriate to secure the welfare, protection, proper care and suitable support of the child. Accordingly, we reverse the trial court's order denying the request of the minor child and the respondent mother for posttermination visitation with the respondent and remand the case with direction to consider the request consistent with the standard we now establish. Specifically, trial courts have authority pursuant to § 46b-121 (b) (1) to consider motions for posttermination visitation within the context of a termination proceeding and can order such visitation if necessary or appropriate to secure the welfare, protection, proper care and suitable support of the child.

I

The following facts, as found by the trial court or contained in the record, and procedural history are

undisputed. The respondent gave birth to the child in the fall of 2017, and, while in the hospital, the child tested positive for opiates and required treatment for withdrawal. To ensure the child's safety, the petitioner moved for an order of temporary custody and petitioned the trial court for a finding of neglect. The trial court issued an ex parte order removing the child from her parents' custody and vesting temporary custody of her with the petitioner. The petitioner placed the child with the paternal aunt, and the court issued specific steps for the respondent to take to regain custody of the child. The trial court then held a hearing on the order of temporary custody at which both parents agreed to sustain the order but entered pro forma denials as to the neglect allegations. The trial court again issued specific steps for the respondent to take to regain custody of the child, including drug treatment, individual therapy, parenting classes, and supportive housing for transience.

In early January, 2018, the trial court adjudicated the child neglected, committing her to the petitioner. The trial court also issued final specific steps for the respondent to take to regain custody of the child. The respondent failed to comply fully with the final specific steps and was in and out of jail in connection with various offenses. While incarcerated, she maintained visitation with the child but, for the majority of the time she was not incarcerated, she failed to maintain visitation. Toward the end of 2018, she was arrested and incarcerated again. In November, 2018, the petitioner filed a petition to terminate the respondent's parental rights, alleging, inter alia, that, pursuant to § 17a-112 (j) (3) (B), she had failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the child's age and needs, she could resume a responsible position in the child's life, and that, pursuant to § 17a-112 (j) (3) (A), the respondent had abandoned the child in that she had

In re Ava W.

failed to maintain a reasonable degree of interest in or concern or responsibility for the child's welfare.

The record indicates that, at some point prior to the commencement of the termination hearing, the respondent had indicated a willingness to consent to the termination of her parental rights. At the outset of the hearing, the trial court therefore canvassed the respondent to confirm that she was in fact voluntarily and willingly consenting to the termination of her parental rights. The court asked whether she had had enough time to speak with her attorney about her decision to consent, and she replied that she did not think so, causing the trial court to reject her consent and to proceed to trial. During the trial, a social worker with the Department of Children and Families (department), Darryen B. Gripes, who had been assigned to the child, testified that she had observed a strengthening bond between the respondent and the child during visits when the respondent was incarcerated. Gripes also testified that the frequency of the visits had helped establish that bond and that the respondent's presence had been a positive relationship in the child's life. In light of that bond, counsel for the child asked the trial court to consider an order of posttermination or postadoption visitation between the child and the respondent. The trial court directed the parties to submit briefs on the issue.[2]

Subsequently, the trial court issued a memorandum of decision regarding the termination of the respondent's parental rights and then, in a separate memorandum of decision, denied the request for posttermination visitation. In its decision terminating the respondent's parental rights, the court found, by clear and convincing evidence, that the petitioner had established the statu-

[2] Although the child's counsel initially requested posttermination visitation, the respondent filed her own brief in support of posttermination visitation, in which she agreed with and adopted the arguments advanced by the child's counsel.

In re Ava W.

tory grounds for termination and, accordingly, granted the petition for termination of the respondent's parental rights.[3] In its second decision, regarding the respondent's request for posttermination visitation with the child,[4] the court determined that it would not order posttermination visitation because (1) the parties did not enter into a cooperative postadoption agreement, (2) the court had "not determined whether postadoption contact is in the best interest of the child," and (3) there was "no presumption that the child has contact with a biological parent whose rights were terminated, absent a cooperative postadoption agreement."

Following the judgment, the respondent appealed to the Appellate Court but did not contest the trial court's termination of her parental rights. Rather, she challenged only the trial court's decision declining to order posttermination visitation. The petitioner moved to dismiss the respondent's appeal as to the posttermination visitation issue on the ground that the respondent lacked standing because she was not aggrieved by the trial court's order. The Appellate Court denied the petitioner's motion without prejudice, permitting the petitioner to raise the jurisdictional issue in her brief on the merits. After the parties filed their briefs and the appeal was submitted for decision, the Appellate Court notified this court of its "opinion that the appeal is appropriate for Supreme Court review" pursuant to Practice Book § 65-2.[5] We

---

[3] Specifically, the trial court determined that the department had made reasonable efforts to locate and maintain contact with the respondent; see General Statutes § 17a-112 (j) (1); the respondent had abandoned the child; see General Statutes § 17a-112 (j) (3) (A); the respondent had failed to achieve a sufficient degree of personal rehabilitation; see General Statutes § 17a-112 (j) (3) (B); and termination of the respondent's parental rights was in the best interest of the child. See General Statutes § 17a-112 (j) (2).

[4] We use the term "posttermination" visitation to refer to any visitation ordered after parental rights have been terminated, irrespective of whether that visitation occurs preadoption or postadoption.

[5] Practice Book § 65-2 provides in relevant part: "If, at any time before the final determination of an appeal, the Appellate Court is of the opinion that the appeal is appropriate for Supreme Court review, the Appellate Court

336 Conn. 545 MAY, 2021 553

In re Ava W.

agreed and transferred the appeal to this court pursuant to that rule of practice and General Statutes § 51-199 (c).[6]

II

On appeal to this court, the petitioner reasserts her argument for dismissal of the respondent's appeal on the ground that the respondent lacks standing to challenge the trial court's order regarding posttermination visitation. According to the petitioner, the respondent lacks standing for three reasons. First, she was not aggrieved by the trial court's order declining to grant posttermination visitation with her child in connection with the termination of parental rights proceeding. Second, when the trial court terminated the respondent's parental rights, the parental relationship was completely severed, thereby rendering the visitation issue moot. Third, the respondent did not move to stay the trial court's judgment of termination and chose not to challenge the termination on appeal. For all of these reasons, the petitioner argues that this court lacks subject matter jurisdiction over this appeal and that we should dismiss it.

"We begin by noting that both aggrievement and mootness implicate the court's subject matter jurisdiction. . . . Because [a] possible absence of subject matter jurisdiction must be addressed and decided whenever the issue is raised . . . on appeal . . . we must address whether the petitioner has overcome both hurdles to appellate review. A determination regarding a trial court's subject matter jurisdiction presents a question of law, and . . . we exercise plenary review." (Citations omitted; internal quotation marks omitted.)

may notify the Supreme Court of the reasons why transfer is appropriate. If the Supreme Court transfers the case to itself, the appellate clerk shall promptly notify the parties. . . ."

[6] General Statutes § 51-199 (c) provides in relevant part: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . . The court to which a cause is transferred has jurisdiction."

In re Ava W.

*In re Allison G.*, 276 Conn. 146, 155–56, 883 A.2d 1226 (2005). "[A]lthough it is a critical prerequisite to any court's involvement in a case, we repeatedly have held that, when a decision as to whether a court has subject matter jurisdiction is required, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *In re Matthew F.*, 297 Conn. 673, 689, 4 A.3d 248 (2010), overruled in part on other grounds by *In re Jose B.*, 303 Conn. 569, 34 A.3d 975 (2012).

A

The following legal principles guide our inquiry into whether the respondent has been aggrieved by the trial court's order denying her posttermination visitation with the child and, consequently, whether this court hasappellate jurisdiction over her appeal from the trial court's denial of her request for posttermination visitation. General Statutes § 52-263 grants the right of appeal to a party who is "aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial . . . ." "Aggrievement, in essence, is appellate standing." *Marine Midland Bank* v. *Ahern*, 51 Conn. App. 790, 797, 724 A.2d 537 (1999), appeal dismissed, 252 Conn. 151, 745 A.2d 189 (2000). "It is axiomatic that aggrievement is a basic requirement of standing, just as standing is a fundamental requirement of jurisdiction. . . . There are two general types of aggrievement, namely, classical and statutory; either type will establish standing, and each has its own unique features." (Internal quotation marks omitted.) *Perry* v. *Perry*, 312 Conn. 600, 620, 95 A.3d 500 (2014). "The test for determining [classical] aggrievement encompasses a well settled twofold determination: first, the party claiming aggrievement must demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest shared by the community as a whole; second, the party claiming aggrievement must establish that this specific personal and legal

In re Ava W.

interest has been specially and injuriously affected by the decision.'' (Internal quotation marks omitted.) *In re Allison G.*, supra, 276 Conn. 157.

Standing for purposes of bringing an action differs from the aggrievement requirement for appellate review under § 52-263. A party who fails to establish standing and to pursue the action before the trial court; e.g., *Connecticut Associated Builders & Contractors, Inc.* v. *Anson*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-98-0579841-S (October 26, 1998) (23 Conn. L. Rptr. 1, 5) (trial court granted defendants' motion to dismiss because plaintiffs failed to demonstrate requisite conditions for standing), aff'd, 251 Conn. 202, 740 A.2d 804 (1999); is aggrieved by the trial court's determination and can then seek review of that judgment on appeal. See, e.g., *Connecticut Associated Builders & Contractors* v. *Anson*, 251 Conn. 202, 206, 740 A.2d 804 (1999) (plaintiffs appealed from judgment of trial court dismissing claims for lack of standing). The question of whether the trial court correctly determined whether the party lacked standing to bring the action in the first place is the merits question for the reviewing court—not a question of appellate aggrievement.

With these principles in mind, we turn to the elements of appellate aggrievement as applied to the present case. The respondent clearly satisfies both requirements of appellate aggrievement—her interest is distinguished from a general interest shared by the community, and the trial court's denial of her request for posttermination visitation injuriously affected her.

First, she has a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest shared by the community, because she was a party to the underlying litigation who requested that the trial court act pursuant to its common-law authority. She was not merely a participant in that litiga-

In re Ava W.

tion. See *Hartford Distributors, Inc.* v. *Liquor Control Commission*, 177 Conn. 616, 620, 419 A.2d 346 (1979) ("[m]ere status, however, as a party or a participant in a hearing before an administrative agency does not in and of itself constitute aggrievement for the purposes of appellate review"). She was the respondent in a proceeding in which the petitioner sought to terminate her parental rights. In the course of that proceeding, she requested that the trial court permit and order posttermination visitation with her child. In that way, she occupies a position similar to other parties who have requested relief that a trial court has denied. See *Argent Mortgage Co., LLC* v. *Huertas*, 288 Conn. 568, 581–82, 953 A.2d 868 (2008) (concluding that trial court should have dismissed as moot defendant's motion to open foreclosure judgment, instead of denying motion, because defendant filed motion five months after title vested in plaintiff).

In fact, whether a trial court correctly concludes that it lacks authority to act is an issue often raised on appeal, without discussion as to whether the appellant, upon being denied the relief requested, has been aggrieved. See, e.g., *Kim* v. *Magnotta*, 249 Conn. 94, 96–97, 733 A.2d 809 (1999) ("The specific question is whether a trial court . . . has the authority to set the judgment aside after the expiration of the four month limitation period contained in [General Statutes] § 52-212a. We conclude that the trial court has discretion to exercise such authority." (Footnote omitted.)); *McLoughlin* v. *McLoughlin*, 157 Conn. App. 568, 570, 118 A.3d 64 (2015) (Appellate Court reviewed plaintiff's claim that trial court lacked authority to distribute disputed personal property to defendant postjudgment). The respondent in the present case is the proper party to request an adjudication of whether the trial court incorrectly concluded that it lacked authority to grant a request for posttermination visitation. The determina-

tion as to whether the respondent has a legally protected interest in posttermination visitation, and whether the trial court has invaded that interest, is the merits question and the question we ultimately must answer.

Second, the respondent suffered an injury as a result of the trial court's decision because the trial court denied her request for posttermination visitation. Her claim that the trial court incorrectly concluded that it lacked authority to grant posttermination visitation constitutes a real and present harm. The trial court's termination of her parental rights does not eliminate that potential harm of being denied posttermination visitation with the child, if, indeed, the court has authority to order it, which is the merits. We conclude that the respondent satisfies both the specific interest and specific injury prongs to overcome the aggrievement hurdle to appellate review. The petitioner's argument that the termination of parental rights somehow affected the respondent's ability to bring this appeal is more properly characterized as an issue of mootness, to which we now turn.

B

In addition to her aggrievement argument, the petitioner contends that the respondent lacks standing because the trial court's termination of the respondent's parental rights rendered the visitation issue moot. According to the petitioner, within the context of child protection cases, aggrievement, standing, and mootness "sometimes turn on whether the respondent parent's parental rights are intact or have been terminated." Termination of parental rights is a "complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent''; General Statutes § 17a-93 (5); so that, in the petitioner's view, "a terminated parent has no right to visitation . . . .'' Once the respondent's parental rights

In re Ava W.

had been terminated, the petitioner argues, the respondent no longer had a right to visit with the child and, thus, had no specific, personal and legal interest that was adversely affected by the trial court's failure to order posttermination visitation. Therefore, the petitioner contends, the issue of posttermination visitation is no longer an actual controversy, and the question of whether the trial court properly declined to order posttermination visitation is moot. We do not agree.

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction. . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. . . . Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant. . . . A case is considered moot if [the trial] court cannot grant the appellant any practical relief through its disposition of the merits." (Internal quotation marks omitted.) *In re Egypt E.*, 322 Conn. 231, 241, 140 A.3d 210 (2016). "Mootness presents a circumstance wherein the issue before the court has been resolved or had lost its significance because [of] a change in the condition of affairs between the parties." *Boisvert* v. *Gavis*, 332 Conn. 115, 139, 210 A.3d 1 (2019).

One example of a circumstance in which courts have determined that the termination of parental rights may render moot a parent's motion for visitation arises when motions for *pre*termination visitation, or motions to modify *pre*termination visitation orders, are consolidated into a termination proceeding. This happens frequently. See, e.g., *In re Carla C.*, 167 Conn. App. 248, 255–56,

143 A.3d 677 (2016) (trial court consolidated father's pretermination motion for visitation with mother's petition for termination of his parental rights); *In re Destiny R.*, 134 Conn. App. 625, 633–34, 39 A.3d 727 (trial court consolidated respondent's motion for modification with termination of parental rights trial), cert. denied, 304 Conn. 932, 43 A.3d 660 (2012). The petitioner, in her brief, highlights cases in which courts have determined that, when the statutory grounds for termination exist and termination is in the child's best interest, any consolidated pretermination motions seeking immediate visitation or modification of existing visitation orders are rendered moot. See, e.g., *In re Victor D.*, Docket No. CP-10-007160-A, 2014 WL 7461459, *57 (Conn. Super. November 7, 2014) ("[h]aving terminated the father's parental rights, the motion for overnight visitation and any outstanding motions relative to visitation are now moot"); *In re Nayya M.*, Docket No. CP-10-012977-A, 2012 WL 2855816, *31 (Conn. Super. June 7, 2012) ("[a]s the court has determined to terminate the [parents'] rights . . . the motion to cease their visitation is arguably moot"); *In re Daniel C.*, 1999 WL 558102, *1 n.2 (Conn. Super. July 22, 1999) ("[b]ecause the court grants the petitions for termination of parental rights, the motion for unsupervised visitation is rendered moot and therefore denied based on mootness"), aff'd, 63 Conn. App. 339, 776 A.2d 487 (2001).

This court never has explained why pretermination visitation motions become moot upon the termination of parental rights. To resolve the petitioner's jurisdictional challenge in the present case, it is helpful that we do so.

Parents' right to visitation with their child is founded on both the constitutional protection afforded parents to direct their child's upbringing; see, e.g., *Boisvert* v. *Gavis*, supra, 332 Conn. 131; and, in circumstances in which the child is no longer under the parents' care and

In re Ava W.

custody, their statutory right to visitation. See General
Statutes § 17a-10a. Section 17a-10a (a) directs the peti-
tioner to "ensure" that children "placed in the care and
custody of the commissioner . . . [are] provided visi-
tation with . . . parents and siblings . . . ." It follows
that, when the court has terminated parental rights, the
constitutional right to direct the child's upbringing, as
well as the statutory right to visitation, no longer exists
because the parent-child relationship has been severed.
See General Statutes § 17a-93 (5);[7] cf. *Boisvert* v. *Gavis*,
supra, 139–40. Therefore, pretermination motions seek-
ing immediate visitation or modification of existing vis-
itation orders, premised on these constitutional and
statutory rights, are rendered moot by an order of termi-
nation.

The petitioner analogizes the present case to those
cases in which a pretermination motion for visitation
is consolidated within the termination hearing and visi-
tation is rendered moot upon the termination of paren-
tal rights. We disagree with the petitioner that the anal-
ogy is apt. The respondent in the present case did not
seek an order of visitation or modification of an existing
visitation order during the pendency of the litigation on
the basis of her constitutional or statutory right to visita-
tion as a parent. Rather, counsel for the child requested
that the trial court consider whether some or any form
of contact with the respondent, *posttermination* and in
light of the extinguishment of the respondent's parental
rights, would be in the best interest of the child. That
distinction, in and of itself, transforms the nature of
the respondent's position. She does not seek to enforce
her rights as a parent to continued visitation. To the

[7] General Statutes § 17a-93 (5) provides: " 'Termination of parental rights'
means the complete severance by court order of the legal relationship, with
all its rights and responsibilities, between the child and the child's parent
or parents so that the child is free for adoption except it shall not affect
the right of inheritance of such child or the religious affiliation of such
child . . . ."

contrary, she is in the same position as any other litigant
who is aggrieved by the trial court's resolution of a
motion for equitable relief. See part II A of this opinion
(citing cases in which Appellate Court reviewed trial
court decisions on motions for equitable relief). The
issue has not been rendered moot on the basis of the ter-
mination of the parent-child relationship.

Nevertheless, the petitioner urges this court to rely
on *In re Candace H.*, 259 Conn. 523, 790 A.2d 1164
(2002), for ''the inescapable conclusion that, once the
[respondent] mother's parental rights were terminated,
there no longer was any practical relief the court could
afford her regarding visitation because she no longer
had a right to visit the child.'' But *In re Candace H.* is
factually and procedurally different from the present
case and is much more analogous to the cases discussed
previously, in which a pretermination motion for visita-
tion is consolidated with the termination of parental
rights hearing and visitation is rendered moot upon the
court's termination of parental rights.

In *In re Candace H.*, the respondent mother moved
for visitation while the child remained in the petitioner's
custody and prior to the petitioner's seeking the termi-
nation of the mother's parental rights. Id., 525. The
trial court denied the motion for visitation, finding that
visitation was not in the child's best interest. Id. How-
ever, at that time, the trial court did not bar future vis-
itation entirely but concluded that the petitioner, in her
discretion, together with the foster parents, might per-
mit future visitation with the respondent, as long as
the *petitioner* determined it to be in the child's best
interest. Id.

Then, before the petitioner initiated the termination
of parental rights proceeding, the respondent mother
appealed to the Appellate Court, claiming that the trial
court had (1) abused its discretion in denying her

motion for visitation, and (2) impermissibly delegated
to the petitioner and the child's foster parents the respon-
sibility for determining whether visitation was in the
child's best interest. *In re Candace H.*, 63 Conn. App. 493,
494, 776 A.2d 1180 (2001). The Appellate Court affirmed
the judgment as to the denial of visitation and reversed
the judgment on the issue of delegation. Id., 504.

The *petitioner* then sought certification to appeal to
this court, which was granted, and the sole issue on
appeal became whether the trial court properly dele-
gated to the petitioner and the foster parents the court's
independent obligation to determine and further the
child's best interest regarding visitation.[8] *In re Candace
H.*, supra, 259 Conn. 525–26. While that certified appeal
was pending, however, the mother voluntarily con-
sented to the termination of her parental rights. Id.,
526. This court then dismissed the mother's appeal as
moot, explaining briefly that, "[w]hen, during the pen-
dency of an appeal, events have occurred that preclude
an appellate court from granting any practical relief
through its disposition of the merits, a case has become
moot." (Internal quotation marks omitted.) Id.

Clearly, the circumstances in *In re Candace H.* had
changed during the pendency of the appeal in a way
that mooted the visitation issues on appeal in that case.
The respondent mother had voluntarily relinquished her
parental rights, severing the parent-child relationship
and thus extinguishing her constitutional and statutory
rights to a pendente lite order of visitation. Id. As in
the cases involving pretermination visitation discussed
previously—which also were based on constitutional
and statutory rights to visitation—the respondent moth-

_____

[8] This court granted certification on this issue: "Did the Appellate Court
properly conclude that the trial court impermissibly delegated to the [depart-
ment] the responsibility of determining, in the future, whether visitation by
the respondent mother is in the best interests of the child?" *In re Candace
H.*, 257 Conn. 907, 777 A.2d 686 (2001).

er's assertion in *In re Candace H.* of a right to visitation
and, concomitantly, the petitioner's appeal, in which
the petitioner claimed the authority to manage that visitation upon the court's delegation of it to her—were
rendered moot when the respondent mother consented
to the termination of her parental rights. See *In re Victor
D.*, supra, 2014 WL 7461459, *57; *In re Nayya M.*, supra,
2012 WL 2855816, *31; *In re Daniel C.*, supra, 1999 WL
558102, supra, *1 n.2. The request for posttermination
visitation at issue in the present case does not fall within
the ambit of the cases just described because the visitation sought is not premised on the parent's constitutional
or statutory rights. Rather, the respondent's request,
like the request of the child, could seek only to secure
the welfare, protection, proper care and suitable support of the child.

In light of our clarification as to when a termination
of parental rights renders an appeal regarding visitation
moot, we turn back to the justiciability requirements
in the present case. See *In re Egypt E.*, supra, 322 Conn.
241. We conclude that these requirements have been
satisfied because (1) there is an actual live controversy
between the respondent and the petitioner as to whether
the trial court correctly determined that it lacked authority to order posttermination visitation, (2) the parties'
interests are adverse, the respondent asserting that the
trial court has authority to order posttermination visitation and the petitioner asserting that the trial court
correctly determined that it lacked authority to issue
such an order, (3) this court is capable of adjudicating
whether the trial court had authority to order posttermination visitation, and (4) our determination of whether
the trial court correctly concluded that it lacked authority to order posttermination visitation could result in
practical relief to the respondent if posttermination visitation is, in fact, necessary or appropriate to secure the
welfare, protection, proper care and suitable support

In re Ava W.

of the child. See id. Finally, no intervening circumstance has arisen during the pendency of the appeal that has resolved the issue of posttermination visitation or rendered it insignificant. Accordingly, we conclude that the issue is not moot.

C

Last, the petitioner asserts that the respondent lacks standing to appeal from the posttermination visitation order because "actions . . . in juvenile matters" are not automatically stayed pursuant to Practice Book § 61-11,[9] and the respondent failed to seek or to obtain a discretionary stay of the termination judgment pursuant to Practice Book § 61-12.[10] The petitioner also asserts that the respondent lacks standing because she failed to appeal from the trial court's judgment terminating her parental rights. We are unpersuaded.

The provisions of our rules of practice that permit a parent to seek a discretionary stay of execution during an appeal of the trial court's judgment terminating parental rights do not apply to the respondent because she does not seek to delay enforcement of the termination order. By appealing, she seeks an entirely different remedy—the trial court's consideration of posttermination visitation that "would be appropriate to secure the child's welfare, protection, proper care and suitable support." As we previously stated, posttermination visi-

---

[9] Practice Book § 61-11 (a) provides in relevant part that "proceedings to enforce or carry out the judgment or order shall be automatically stayed until the time to file an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause. . . ."

Section 61-11 contains several exceptions to this general rule, including that "there shall be no automatic stay in actions . . . in juvenile matters . . . ." Practice Book § 61-11 (b).

[10] Practice Book § 61-12 provides in relevant part: "In noncriminal matters in which the automatic stay provisions of Section 61-11 are not applicable and in which there are no statutory stay provisions, any motion for a stay of the judgment or order of the Superior Court pending appeal shall be filed in the trial court. . . ."

tation orders differ from pretermination visitation orders because they are not premised on an individual's constitutional or statutory rights as a parent. Posttermination visitation orders also serve a different function. See *Michaud* v. *Wawruck*, 209 Conn. 407, 413, 551 A.2d 738 (1988) (''[o]ur statutes recognize that visitation encompasses considerations that differ from those that govern custody, guardianship or parental status''). Prior to termination, the goal of visitation is reunification; see General Statutes § 17a-112 (j);[11] and visitation is mandated pursuant to § 17a-10a. See part II B of this opinion. After termination, the goal is not reunification, and visitation is not mandated pursuant to any statute. Rather, according to the respondent, some possible goals of posttermination visitation could be to ''maintain ongoing contact with a biological parent'' or ''to prevent the sudden and harmful destruction of existing familial bonds important to the child's welfare.'' For example, the respondent cites a case in which the Massachusetts Supreme Judicial Court stated that the child ''should have postadoption (and posttermination) contact with the father in the form of at least two face-to-face visits per year . . . .'' *In re Adoption of Rico*, 453 Mass. 749, 756, 905 N.E.2d 552 (2009). That kind of order differs dramatically in purpose and, perhaps, frequency from visitation established to avoid harm to the parent-child relationship should termination never occur and the parent and child be reunified. See *In re Daniel C.*, 63 Conn. App. 339, 369, 776 A.2d 487 (2001) (trial court ordered weekly two hour visitation under supervision of department). Consequently, a rule requiring the respondent in the present case to have sought a stay of execution to delay enforcement of the judgment ter-

[11] General Statutes § 17a-112 (j) provides in relevant part: ''The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent . . . .''

In re Ava W.

minating her parental rights would have served no purpose. The respondent, by not appealing from the termination judgment, accepted the court's determination that termination—not reunification—is in the child's best interest. That acknowledgment, however, does not foreclose the possibility that some alternative form of visitation—posttermination—might potentially be "appropriate to secure the child's welfare, protection, proper care and suitable support.''

The petitioner, in support of her position, relies on an Appellate Court case, *In re Amy H.*, 56 Conn. App. 55, 742 A.2d 372 (1999), that she claims stands for the proposition that, "if a terminated parent wants to challenge an order of the trial court regarding visitation, she must not only challenge the judgment terminating her parental rights by appealing from it, but she must also obtain a stay of that judgment.'' In *In re Amy H.*, the trial court, upon ordering termination of the respondent father's parental rights, ordered, sua sponte, that "no visitation would be granted pending appellate resolution of the case . . . .'' *In re Amy H.*, supra, 61. After he filed his appeal, the respondent father failed to move for a stay of execution, and the Appellate Court therefore concluded that he could not challenge the visitation order as a result of his failure to seek a stay. Id. As in *In re Candace H.*, the trial court's termination of parental rights in *In re Amy H.* rendered the *pretermination* visitation issue moot because the right to continue visitation during an appeal, premised on constitutional and statutory parental rights, was extinguished when the respondent father's parental rights were terminated and no stay of execution was entered. That conclusion does not answer the question in the present case—whether a parent seeking an order for *posttermination* visitation must move to delay enforcement of the judgment terminating her parental rights,

and *In re Amy H.* therefore does not dictate the rule we must implement.

Another reason for declining to adopt a rule requiring a parent to seek a stay of the judgment of termination of parental rights is that it would encourage further litigation on the issue of termination in cases in which the trial court already has determined that termination is in the best interest of the child and no one disputes that determination. If the only relief sought on appeal is posttermination visitation, then requiring a parent to seek review of the termination decision or a stay of that judgment merely to preserve the possibility of pursuing posttermination visitation wastes judicial resources and thwarts the ultimate goal in any juvenile matter—ensuring the welfare of the child. Neither the respondent nor counsel for the child in the present case contests that the trial court properly terminated the respondent's parental rights. There is no dispute as to that issue, no justiciable controversy, and no reason to require the respondent to appeal from that judgment. The controversy centers exclusively on whether the trial court had the authority to order posttermination visitation between the child and the respondent.

We acknowledge that there are cases in which the trial court has concluded that pretermination visitation for the purpose of reunification is not in the best interest of the child, and, in many of those cases, posttermination visitation similarly might not be appropriate to secure the child's welfare, protection, proper care and suitable support. That reality does not, however, factor into an evaluation of whether this court has jurisdiction over the respondent's appeal. The respondent has overcome the two jurisdictional hurdles of aggrievement and mootness, and we retain subject matter jurisdiction over whether the trial court correctly determined that it lacked the legal authority to order posttermination visitation between the respondent and the child.

In re Ava W.

III

Having concluded that this court has jurisdiction over the respondent's appeal, we turn to her argument that the trial court incorrectly determined that it lacked authority to order posttermination visitation pursuant to its broad equitable powers. Specifically, the respondent contends that (1) pursuant to common law and § 46b-121 (b) (1), the Superior Court is vested with the authority to issue *any* order with respect to the welfare of the child, (2) the trial court misapplied the law when it determined that the statutory open adoption provisions of § 17a-112 (b) through (h) "constituted the only permissible means by which the legislature intended the Superior Court to involve itself in matters affecting posttermination contact between a child and a biological parent whose rights [with respect] to the child have been terminated," and (3) the trial court should have considered the posttermination request as part of the termination of parental rights proceeding. The respondent asks us to reverse the order of the trial court denying the request for posttermination visitation and to remand the case to that court "to consider whether posttermination visitation orders would be appropriate to secure the child's welfare, protection, proper care and suitable support." We agree with the respondent that the Superior Court has broad authority to issue posttermination visitation orders, that the legislature did not limit that authority by enacting § 17a-112 (b) through (h), and that the trial court is best suited to determine, in accordance with § 46b-121 (b) (1), whether posttermination visitation would be necessary or appropriate to secure the welfare, protection, proper care and suitable support of the child.

Our review of the trial court's construction of a statute's limitations on the court's general authority is plenary. See, e.g., *Kim* v. *Magnotta*, supra, 249 Conn. 102–103. We are guided by the well established principles

governing statutory construction. See, e.g., *Marchesi* v. *Board of Selectmen*, 309 Conn. 608, 614–15, 72 A.3d 394 (2013) (discussing process of ascertaining legislative intent pursuant to General Statutes § 1-2z and noting that, "[w]hen construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature" (internal quotation marks omitted)). Additionally, to the extent that we must examine our common law to determine the contours of the trial court's common-law authority, our review also is plenary. See, e.g., *Location Realty, Inc.* v. *Colaccino*, 287 Conn. 706, 724, 949 A.2d 1189 (2008) (construing statute to determine whether it abrogated common law).

A

We first address the respondent's argument that the trial court had the authority to issue an order for posttermination visitation as long as it found it necessary or appropriate to the child's welfare. We begin by looking to our courts' common-law and statutory authority over juvenile matters. Prior to the legislature's enactment of § 46b-121 (b) (1), our courts had broad authority over juvenile matters pursuant to the common law. See *In re Appeal of Kindis*, 162 Conn. 239, 240, 294 A.2d 316 (1972), citing *Cinque* v. *Boyd*, 99 Conn. 70, 82, 121 A. 678 (1923); *In re Appeal of Kindis*, supra, 240 ("[t]he authority of the state and the exercise of its jurisdiction [over fostering care for neglected and uncared for children] is well established in the common law"). That authority dates back to early English law when children were wards of chancery and chancellors "exercised the prerogative powers of the crown in caring for unfortunate minors." *Cinque* v. *Boyd*, supra, 80. "Classic examples of the exercise of this power" occurred in two separate incidents in the early nineteenth century in which children were removed from the custody of a parent who had "declared atheism" and from the cus-

tody of another parent "on account of [the parent's] profligate life . . . ." Id., 80–81.

American states, from that time on, "continually enlarge[d] their protective and summary jurisdiction for the protection and care of individuals . . . unfortunate in environment . . . [e]specially . . . with regard to children so circumstanced." Id., 81. For example, in 1883, this court upheld as constitutional a statute that granted justices of the peace the power to commit to the "State Reform School . . . any boy under the age of sixteen years, who is in danger of being brought up, or is brought up, to lead an idle or vicious life." (Internal quotation marks omitted.) *Reynolds* v. *Howe*, 51 Conn. 472, 476 (1884), quoting Public Acts 1881, c. 119, § 1. Responding to the objection that the statute deprived the father of the services of his son, the court in *Reynolds* explained that it was "the duty of the parent to bring up his children to lives of industry and virtue, and where he neglects this duty, and is bringing them up to vice, he is the last one who should complain of the loss of their services." *Reynolds* v. *Howe*, supra, 478. Summarizing the history of the court's authority to act in juvenile matters, this court stated: "We have consistently held in matters involving child custody that while the rights, wishes and desires of the parents must be considered it is nevertheless the ultimate welfare of the child which must control the decision of the court. . . . In fact, the best interest of the child standard is implicitly incorporated into the commitment statute . . . which authorizes the Juvenile Court to commit the custody of a child to another if it finds that the child needs the care, discipline or protection of the state." (Citations omitted; internal quotation marks omitted.) *In re Appeal of Kindis*, supra, 162 Conn. 242–44. These cases suggest that, under our common law, courts had broad authority to act in the child's best interest in juvenile matters. More specifically, we are able to glean

In re Ava W.

from historical cases that, as part of their common-law authority, our courts contemplated termination and limitation of parental rights (described at the time as custody and modification of custody). See, e.g., *Woodward's Appeal*, 81 Conn. 152, 166, 70 A. 453 (1908) ("[parental] rights are not absolute rights . . . [and] they may be modified or suspended against [a parent's] will by action of the court"); *Kelsey* v. *Green*, 69 Conn. 291, 299, 37 A. 679 (1897) ("In contentions of this kind the child has the right to the protection of the court against such misfortunes of its parents, or the influences of such gross and immoral practices as will seriously endanger [the child's] life, health, morals or personal safety. But what measure of wickedness or profligacy on the part of the parent will be sufficient to warrant the court to deprive the parent of his natural right to the minor child, must necessarily depend upon the facts and circumstances of each particular case." (Internal quotation marks omitted.)).

In 1921, the legislature passed "An Act concerning Juvenile Courts," through which it undertook to "provide for the proper care, custody, education and rearing of children under the age of sixteen, who are dependent, uncared-for, neglected, defective or delinquent." *Cinque* v. *Boyd*, supra, 99 Conn. 75–76; see Public Acts 1921, c. 336. Specifically, the act granted the juvenile courts the "authority to make and enforce, within their respective territorial limits, such orders directed to parents, guardians, custodians or other adult persons, owing some legal duty to a child therein as it shall deem necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child subject to its jurisdiction." Public Acts 1921, c. 336, § 3.[12] That author-

_____

[12] When the legislature passed this statute, the Juvenile Court was a separate but nonconstitutional court. "[I]n 1978, the General Assembly enacted General Statutes § 51-164s, which merged the Juvenile Court and the Superior Court in order to maximize the efficiency of scarce judicial resources. Under § 51-164s, [t]he [S]uperior [C]ourt shall be the sole court of original jurisdiction for all causes of action, except such actions over which the

In re Ava W.

ity continues to reside, largely unchanged, in the Superior Court for Juvenile Matters pursuant to § 46b-121 (b) (1), which provides in relevant part: " 'In juvenile matters, the Superior Court shall have authority *to make and enforce such orders* directed to parents . . . guardians, custodians or other adult persons owing some legal duty to a child or youth therein, *as the court deems necessary or appropriate* to secure the welfare, protection, proper care and suitable support of a child or youth subject to the court's jurisdiction or otherwise committed to or in the custody of the Commissioner of Children and Families.' " (Emphasis in original.) *In re David B.*, 167 Conn. App. 428, 447, 142 A.3d 1277 (2016).

A plain reading of § 46b-121 (b) (1) in its current form quite apparently grants the Superior Court comprehensive authority to issue orders in juvenile matters. The statute broadly enables the court to issue any order that it deems not only "necessary" but also "necessary *or* appropriate . . . ." (Emphasis added.) General Statutes § 46b-121 (b) (1). The language also enables the court to issue orders directed at a broad range of actors and does not limit the scope of the statute to biological parents; rather, it extends it to any "other adult persons owing some legal duty to a child . . . ." General Statutes § 46b-121 (b) (1). Although § 46b-121 (b) (1) does not expressly mention orders for posttermination visitation, neither does it expressly preclude that authority. In our view, a broad statutory grant of authority and a "lack of limiting language . . . supports [a] conclu-

courts of probate have original jurisdiction, as provided by statute. . . . [With the enactment of § 51-164s], the legislature vested in the Superior Court the jurisdiction that had until then resided in the Juvenile Court." (Emphasis omitted; internal quotation marks omitted.) *In re Matthew F.*, supra, 297 Conn. 690. Although the statute at that time explicitly excluded the Juvenile Court from maintaining jurisdiction over "matters of . . . adoption"; Public Acts 1921, c. 336, § 3; "[a]ll juvenile matters now come under the administrative umbrella of the family division of the Superior Court." (Internal quotation marks omitted.) *In re Matthew F.*, supra, 690, quoting *State* v. *Kelley*, 206 Conn. 323, 328, 537 A.2d 483 (1988).

In re Ava W.

sion'' that the Superior Court has the authority to issue such an order. *Marchesi* v. *Board of Selectmen*, supra, 309 Conn. 619; id., 617–19 (construing General Statutes § 13a-40 to grant Superior Court authority to conduct trial de novo on basis of broad statutory terms and lack of limiting language). This conclusion is buttressed by the common-law backdrop against which the legislature enacted § 46b-121 (b) (1), which similarly reflects a broad authority residing in our courts to issue orders impacting parental rights, including termination and visitation.

Appellate Court case law interpreting § 46b-121 (b) (1) supports this broad construction. *In re David B.*, supra, 167 Conn. App. 448, described § 46b-121 as a "broad statutory grant of authority" sufficient to include the authority of the court to substitute a child's newly appointed guardian for his previous guardian, as necessary to protect the child's welfare. In *In re Alexandria L.*, 155 Conn. App. 624, 111 A.3d 904, cert. denied, 316 Conn. 915, 111 A.3d 884 (2015), the Appellate Court declined to construe the statute restrictively as to grant jurisdiction to the court to make or to enforce orders only after a child has been committed to or placed in the custody of the petitioner. Id., 630; see id., 632 (concluding that § 46b-121 properly authorized interim orders and subsequent enforcement of orders). In *In re Jeffrey C.*, 64 Conn. App. 55, 779 A.2d 765 (2001), rev'd on other grounds, 261 Conn. 189, 802 A.2d 772 (2002), the Appellate Court, construing § 46b-121, concluded "that a trial court *unquestionably* has the power . . . to find in contempt those persons who violate orders pertaining to juvenile matters.'' (Citation omitted; emphasis added; footnote omitted.) Id., 60–61.

Superior Court case law also demonstrates that § 46b-121 frequently has been relied on as the legal basis for issuing a wide variety of orders. For example, trial courts have relied on this statutory authority to issue

orders for unsupervised visitation; *In re Nicholas B.*, Docket Nos. CP-08-017705-A and CP-08-17706-A, 2010 WL 392298, *9 (Conn. Super. January 5, 2010); to grant requests for hearings to enforce visitation orders; *In re Elana H.*, 2001 WL 219641, *2–3 (Conn. Super. February 7, 2001); and to modify the terms of an order of temporary custody. *In re Aracelli G.*, 1993 WL 524944, *2 (Conn. Super. December 9, 1993). In *In re Dustin C.*, 1997 WL 429553 (Conn. Super. July 17, 1997), the trial court cited the statute as the legal basis for issuing orders, including, but not limited to, an order for the parties to appear for a case conference, an order for the department to provide timely and appropriate rehabilitative services, an order directing the department to report all information about a conversation regarding abuse to the Office of the State's Attorney for possible investigation, an order mandating that visits or contacts between the child and his legal guardian "be supervised by a person who is a statutorily mandated child abuse reporter," an order requiring the department to make arrangements for a child to be tested for a sexually transmitted disease, and an order for a child to be physically examined for evidence of sexual abuse. Id., *6–8.

Additionally, the broad grant of authority in § 46b-121 (b) (1) does not expressly abrogate the trial court's authority to regulate visitation in any way. It does not limit the trial court's authority to issue a posttermination visitation order, and, therefore, our principles of statutory construction require that we interpret § 46b-121 as encompassing such authority. See, e.g., *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 353–54 n.9, 488 A.2d 790 (1985) (noting implicit authority in General Statutes (Rev. to 1985) § 46b-129 (d) to order continuing custody of neglected child in natural parent, although not expressly provided for in that statute because permissive statutory language implies that "judicial determination may also be made that under the particular circumstances of a given case the best interests of the

child are furthered only by permitting the natural parent to retain custody'').

This court's decision in *Michaud* v. *Wawruck*, supra, 209 Conn. 407, provides an example of trial courts' authority to issue orders regarding visitation. In *Michaud*, this court considered whether a written visitation agreement between the plaintiff, the minor child's genetic mother, and the adoptive parents violated public policy. See id., 408. As part of the underlying proceedings, the mother brought an action to set aside the Probate Court decree that terminated her parental rights as to the child. Id., 408–409. The trial court then permitted the child's foster parents, who were seeking to adopt the child, to intervene. Id., 409. ''The plaintiff agreed to withdraw her lawsuit, and to allow the adoption to go forward, in exchange for the agreement [of the foster parents and the petitioner] to permit regular visitation between the plaintiff and the child during the child's minor years.'' Id. We acknowledged that the right to an open adoption is ''not premised on an ongoing genetic relationship that somehow survives a termination of parental rights and an adoption.'' Id., 412–13. Thus, we did not premise posttermination visitation on constitutional parental rights or the legal relationship between the parties. See part II C of this opinion. Instead, an open adoption agreement permits ''an adult who has had an ongoing personal relationship with the child . . . [to] contract with adopting parents, prior to adoption, for the continued right to visit with the child, so long as that visitation continues to be in the best interest of the child.'' *Michaud* v. *Wawruck*, supra, 413.

This court in *Michaud* concluded that postadoption agreements between a genetic mother and adoptive parents concerning visitation, even in the absence of a statute, do not violate the public policy of Connecticut. Id., 413–14. Consequently, this court remanded the case to the trial court to determine whether the plaintiff's

In re Ava W.

request for an order enforcing the posttermination visitation agreement would be in the child's best interest. Id., 416. Thus, *Michaud* makes clear that, by the time that case was decided, the legislature had not expressly abrogated the authority to make or enforce orders regarding posttermination visitation. On the basis of the plain meaning of the text and prior interpretations of that text, we do not hesitate to conclude that § 46b-121 (b) (1) grants the Superior Court broad authority to issue any order necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child—including an order for posttermination visitation.

In fact, the petitioner does not dispute our conclusion that § 46b-121 (b) (1) constitutes a grant of such broad authority but, instead, urges us to consider that statute's text in relation to Public Acts 2000, No. 00-137, § 1 (P.A. 00-137) (codifying § 17a-112 (b) through (h)), governing cooperative postadoption agreements between genetic parents and intended adoptive parents. The petitioner contends that, pursuant to P.A. 00-137, § 1, the legislature sought to limit the concededly broad grant of authority found in § 46b-121 (b) (1). In the present case, the trial court adopted this rationale, relying on § 17a-112 as the law controlling the issue of posttermination visitation. On the basis of that statute, the trial court concluded that it lacked authority to issue an order for posttermination visitation because the respondent had not met the statutory requirements of the 2000 cooperative postadoption agreement legislation, § 17a-112 (b) through (f). Implicit in the trial court's decision is its conclusion that § 17a-112 (b) through (f) both limit the courts' authority to grant posttermination visitation under § 46b-121 (b) (1) and prohibit the ordering of posttermination visitation in the absence of compliance with the statutory requirements of the cooperative postadoption agreement legislation.

In re Ava W.

The respondent contends that the trial court improperly applied § 17a-112 (b) through (h) because those subsections are not a limitation on the court's broad authority under § 46b-121 (b) (1). In the respondent's view, § 46b-121 (b) (1) codified the Superior Court's "inherent equitable authority at common law to issue any order necessary or appropriate to secure the welfare of a child committed to the court's jurisdiction . . . ." By enacting § 17a-112 (b) through (h), the legislature did not intend to abrogate that authority.

We agree with the respondent that the trial court in the present case had authority to grant posttermination visitation. Specifically, we conclude that the legislature's enactment of § 17a-112 (b) through (h) did not reflect an intention to abrogate or to limit the courts' common-law authority, as codified in § 46b-121 (b) (1), which includes the ability to order posttermination visitation as long as it is necessary or appropriate to secure the welfare, protection, proper care and suitable support of the child. Instead, the legislature intended that § 17a-112 (b) through (h) codify and make regular the process by which parties accomplish *cooperative* post-adoption agreements.

We begin with the statutes at issue. As explained, § 46b-121 (b) (1) sets forth the Superior Court's general grant of authority to issue orders in juvenile matters. Section 17a-112 governs termination of parental rights proceedings,[13] and § 17a-112 (a) specifically permits parents to consent to the termination of their rights

_____

[13] For a court to order termination of parental rights, the petitioner must "prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family; General Statutes § 17a-112 (j) (1); (2) termination is in the best interest of the child; General Statutes § 17a-112 (j) (2); and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3)." *In re Samantha C.*, 268 Conn. 614, 628, 847 A.2d 883 (2004).

In re Ava W.

before the court orders termination, so long as they do so voluntarily and knowingly.[14]

In 2000, the legislature amended § 17a-112 by enacting subsections (b) through (h). See P.A. 00-137, § 1. Those subsections govern cooperative postadoption agreements for postadoption visitation between genetic parents and intended adoptive parents. See General Statutes § 17a-112 (b) through (h). Subsection (b) enables "birth parents and an intended adoptive parent [to] enter into a cooperative postadoption agreement regarding communication or contact between either or both birth parents and the adopted child."[15] General Statutes § 17a-

---

[14] General Statutes § 17a-112 (a) provides in relevant part: "In respect to any child in the custody of the Commissioner of Children and Families in accordance with section 46b-129, either the commissioner, or the attorney who represented such child in a pending or prior proceeding, or an attorney appointed by the Superior Court on its own motion, or an attorney retained by such child after attaining the age of fourteen, may petition the court for the termination of parental rights with reference to such child. The petition shall be in the form and contain the information set forth in subsection (b) of section 45a-715, and be subject to the provisions of subsection (c) of said section. If a petition indicates that either or both parents consent to the termination of their parental rights, or if at any time following the filing of a petition and before the entry of a decree, a parent consents to the termination of the parent's parental rights, each consenting parent shall acknowledge such consent on a form promulgated by the Office of the Chief Court Administrator evidencing that the parent has voluntarily and knowingly consented to the termination of such parental rights. . . ."

[15] General Statutes § 17a-112 (b) provides: "Either or both birth parents and an intended adoptive parent may enter into a cooperative postadoption agreement regarding communication or contact between either or both birth parents and the adopted child. Such an agreement may be entered into if: (1) The child is in the custody of the Department of Children and Families; (2) an order terminating parental rights has not yet been entered; and (3) either or both birth parents agree to a voluntary termination of parental rights, including an agreement in a case which began as an involuntary termination of parental rights. The postadoption agreement shall be applicable only to a birth parent who is a party to the agreement. Such agreement shall be in addition to those under common law. Counsel for the child and any guardian ad litem for the child may be heard on the proposed cooperative postadoption agreement. There shall be no presumption of communication or contact between the birth parents and an intended adoptive parent in the absence of a cooperative postadoption agreement."

112 (b). Cooperative postadoption agreements are permitted under the statute only if ''(1) [t]he child is in the custody of the Department of Children and Families; (2) an order terminating parental rights has not yet been entered; and (3) either or both birth parents agree to a voluntary termination of parental rights, including an agreement in a case which began as an involuntary termination of parental rights.'' General Statutes § 17a-112 (b). Furthermore, the legislature expressly provided that ''[s]uch agreement[s] shall be in addition to those under common law.'' General Statutes § 17a-112 (b).

First, we must determine whether § 17a-112 (b) through (h) abrogated a court's common-law authority to issue orders in juvenile matters and thus serves as a limitation on the court's authority to order posttermination visitation. ''Our determination of whether [§ 17a-112 (b) through (h)] abrogate[s] [the common law] . . . is guided by well established principles. While the legislature's authority to abrogate the common law is undeniable, we will not lightly impute such an intent to the legislature. . . . Thus, [w]hen a statute is in derogation of common law . . . it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction. . . . In determining whether or not a statute abrogates or modifies a [common-law] rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited to matters clearly brought within its scope. . . . The rule that statutes in derogation of the common law are strictly construed can be seen to serve the same policy of continuity and stability in the legal system as the doctrine of stare decisis in relation to case law.'' (Internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 788–89, 865 A.2d 1163 (2005); see also *Raspberry Junction Holding, LLC* v. *Southeastern Connecticut Water Authority*, 331

In re Ava W.

Conn. 364, 370–71, 203 A.3d 1224 (2019) (applying strict construction principles to construe text of special act that codified common-law principles and exceptions to municipal immunity).

The plainly broad language of § 46b-121 (b) (1), coupled with our well established principles regarding implied abrogation, fails to demonstrate a clear intent by the legislature to abrogate the court's authority to issue posttermination visitation orders. Section 17a-112 (b) establishes requirements for "cooperative postadoption agreements . . . ." The operation of § 17a-112 (b), then, is limited in scope to those agreements—not to contested posttermination visitation orders. Additionally, the legislature expressly provided that "[cooperative postadoption] agreement[s] shall be in addition to those under common law." General Statutes § 17a-112 (b). It therefore can hardly be argued that this statutory subsection expressly abrogates the court's authority to issue posttermination visitation orders that the court finds to be "necessary or appropriate to secure the welfare, protection, proper care and suitable support"; General Statutes § 46b-121 (b) (1); of a child when the legislation expressly leaves open other types of agreements. In the absence of language demonstrating the legislature's intent to limit the trial court's authority, we will not extend or enlarge its scope to impute such a purpose.

Despite the absence of language expressly limiting courts' authority, the petitioner contends that § 17a-112 (b) through (h) implicitly limits courts' authority because the more specific provisions of § 17a-112 (b) through (h) must prevail over the more general provision of § 46b-121 (b) (1). "[W]e are mindful of the well established principle of statutory interpretation that requires courts to apply the more specific statute relating to a particular subject matter in favor of the more general statute that otherwise might apply in the

absence of the specific statute.'' (Internal quotation marks omitted.) *Studer* v. *Studer*, 320 Conn. 483, 497, 131 A.3d 240 (2016).

We agree with the petitioner that § 46b-121 (b) (1) generally grants broad authority to courts and that ''§ 17a-112 (b) [and] (c) specifically focus[es] on the issue of postadoption contact . . . .'' We disagree with the petitioner, however, that subsections (b) and (c) fit within the statutory interpretation principle that specific terms must prevail over more general provisions. According to that general principle, ''[w]hen general and specific statutes conflict they should be harmoniously construed so the more specific statute controls.'' (Internal quotation marks omitted.) *State* v. *Whitford*, 260 Conn. 610, 640–41, 799 A.2d 1034 (2002). Section 17a-112 (b) through (h) does not conflict with § 46b-121 (b) (1) because the former applies only to a narrow subset of termination proceedings—proceedings in which parents consent to voluntarily relinquish their parental rights and in which an intended adoptive parent exists and is willing to enter into a contact agreement. See General Statutes § 17a-112 (b) and (c). Section 17a-112 (b) (3) expressly provides that parents can enter into a cooperative agreement if ''either or both birth parents agree to a voluntary termination of parental rights . . . .'' Subdivisions (1) and (2) of § 17a-112 (c) establish that the Superior Court can issue an order for a cooperative agreement only if the ''intended adoptive parent consents . . . execute[s] a cooperative agreement and file[s] the agreement with the court . . . .'' Read in combination, those subdivisions presume that the parent is voluntarily consenting to relinquish his or her parental rights and coming to an agreement with the intended adoptive parents regarding postadoption visitation.

The petitioner's argument fails to consider the wide range of termination circumstances not covered by

§ 17a-112 (b) through (h), including those in the present case. For example, many biological parents *contest* the termination of their parental rights. See, e.g., *In re Walker C.*, 195 Conn. App. 604, 609, 226 A.3d 175 (2020) (petitioner filed petition for termination of parental rights, and trial commenced); *In re Ryan R.*, 102 Conn. App. 608, 616, 926 A.2d 690 (parents contested termination of parental rights, and trial continued for more than four months), cert. denied, 284 Conn. 923, 933 A.2d 724 (2007), and cert. denied, 284 Conn. 924, 933 A.2d 724 (2007). Furthermore, the courts of this state are well aware that, sometimes, there are no intended adoptive parents waiting to assume the rights and responsibilities of parenting the child.[16]

Needless to say, we cannot presume that every termination path has a prospective adoptive family with which a parent may negotiate. Under a plain reading of the statute, § 17a-112 (b) through (h) is itself limited in scope but does not limit the court's authority under § 46b-121 (b) (1). Section 17a-112 (b) through (h) does not take precedence over § 46b-121 (b) (1) but, rather, governs a narrower subset of circumstances in which termination and adoption are contemplated and negotiated. Section 46b-121 (b) (1) governs the court's authority over circumstances that fall outside of cooperative postadoption agreements and grants courts broad authority to issue orders in those circumstances, namely, the present case.[17]

[16] We therefore reject the petitioner's argument that recognizing the trial court's authority to order posttermination visitation would necessarily infringe on the fundamental rights of adoptive parents because not all termination proceedings involve adoptive parents or identified potential adoptive parents.

[17] As evidence that the legislature intended to limit trial courts' authority to order posttermination visitation, the petitioner points to § 17a-112 (b), which provides in relevant part that "[t]here shall be no presumption of communication or contact between the birth parents and an intended adoptive parent in the absence of a cooperative postadoption agreement."

We disagree with the petitioner's interpretation. The plain language, "between the birth parents and an intended adoptive parent," reinforces

In re Ava W.

The present case does not fall within those specific circumstances and, therefore, § 17a-112 (b) through (h) does not apply to limit the court's broad authority under § 46b-121 (b) (1) to issue a posttermination visitation order. During the termination proceeding in the present case, the respondent did not voluntarily consent to relinquishing her parental rights and did not enter into

our interpretation that § 17a-112 (b) applies only to voluntary open adoption termination circumstances. In addition, "no presumption of communication" does not expressly preclude a court from ordering communication if it deems it necessary or appropriate to secure the welfare of the child.

To the extent that any ambiguity exists, the legislative history surrounding the adoption of § 17a-112 (b) through (h) cuts against the petitioner's argument. During the Judiciary Committee hearings, Kristine Ragaglia, then Commissioner of Children and Families, stated that the purpose of § 17a-112 (b) through (h) was to "[create] a recognition for enforceability of open adoptions in Connecticut through the Superior Court." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 2000 Sess., p. 1320. David D. Biklen, the Executive Director of the Connecticut Law Revision Commission, testified that the purpose of an open adoption is to "assist a biological parent in feeling secure in terminating parental rights in a voluntary fashion. If that person, that parent can be part of a process to find where that child may be going and be part of potentially ongoing contacts, that may assist that person in allowing a termination to proceed voluntarily without having to go through a contested termination process. And that's what this process is all about on the cooperative agreement." Id., pp. 1332–33.

In written testimony, Raphael L. Podolsky of the Legal Assistance Resource Center of Connecticut, Inc., stated that "[House Bill] 5707 explicitly makes open adoption agreements enforceable if the termination of parental rights is 'voluntary.' Sometimes such an agreement may be negotiated between the parties in a case which began as an involuntary termination. It is not clear whether such cases are covered by this bill. The bill should make clear that they are, by adding at the end of I. 34 (and other equivalent places): ' . . . including an agreement in a case which began as an involuntary termination of parental rights.' " Conn. Joint Standing Committee Hearings, Judiciary, Pt. 5, 2000 Sess., p. 1572.

Regarding the common-law authority prior to the enactment of § 17a-112 (b) through (h), Judge F. Paul Kurmay, then Probate Court Administrator, submitted written testimony stating that, "[s]ince 'open adoptions' are already permitted under Connecticut common law and since this [b]ill purports to set forth the technical procedures for entering into open adoption agreements, it is extremely important that the [b]ill include a statement that these rights and procedures are *in addition to and not in derogation of the existing common law.*" (Emphasis in original.) Id., p. 1569.

a written agreement with the intended adoptive parents to continue visitation. To the contrary, the trial court proceeded through the adjudicatory and dispositional phases of the termination proceeding, as mandated by statute. During that proceeding, and prior to the termination of the respondent's parental rights, counsel for the child requested that the court consider whether posttermination visitation would serve the best interest of the child. After concluding the proceedings, the trial court correctly determined that it lacked authority to consider posttermination contact pursuant to § 17a-112 (b) through (h) because the statutory requirements had not been met. However, the trial court improperly failed to consider its broader authority under § 46b-121 (b) (1), which permits it to order posttermination visitation if it is necessary or appropriate to secure the welfare, protection, proper care and suitable support of the child.

Section 17a-112 (b) through (h) establishes the requirements for open adoption agreements. Those requirements help to clarify the open adoption process to the benefit of all parties involved—trial courts, the petitioner, biological parents, and intended adoptive parents. Although § 17a-112 (b) through (h), governing cooperative postadoption agreements, might provide the best chance for a parent to negotiate posttermination visitation, we see no evidence in these statutes of the legislature's intent to limit the trial court's authority to issue any order "necessary or appropriate" to "secure the welfare, protection, proper care and suitable support of a child . . . ." General Statutes § 46b-121 (b) (1). To the contrary, we can infer from the statutes that the legislature intended to grant authority to the trial courts to issue any order that would best serve the child. We will not be quick to conclude that the legislature intended to deprive a judge who has just heard evidence about the child's best interest and rendered judgment

from entertaining and ruling on a motion that could help
to secure the welfare of the child. Especially because
that conclusion could deprive a child, faced with termi-
nation of parental rights, of a potentially positive con-
nection to the child's past and future, a deprivation we
are not in a position to evaluate. Our juvenile matters
judges are presented with myriad situations, in some
of which a child might benefit from continued visitation
by a parent. Perhaps this is not one; we will not prejudge
that. Section 17a-112 (b) through (h) governs coopera-
tive postadoption agreements, but it does not limit the
trial court's broad authority pursuant to § 46b-121 (b)
(1) and does not take precedence over the trial court's
broad authority to issue orders. Therefore, the trial court
incorrectly concluded that it lacked authority to issue
an order of posttermination visitation.

B

On the basis of the trial court's incorrect determina-
tion that it lacked authority to issue an order for postter-
mination visitation, the respondent asks that we reverse
the trial court's order denying posttermination visitation
and remand the case for a dispositional hearing to con-
sider the merits of whether a posttermination visitation
order would be in the best interest of the child. By con-
trast, the petitioner argues that, even if the trial court
had authority to grant posttermination visitation, we
should uphold its order on the alternative ground that
it correctly determined that posttermination visitation
would not be in the child's best interest. After review-
ing the record in its entirety, we conclude that the trial
court, believing that it lacked authority to order postter-
mination visitation pursuant to § 17a-112 (b) through
(h), declined to consider whether posttermination visi-
tation would be necessary or appropriate to secure the
welfare, protection, proper care and suitable support
of the child. We therefore agree with the respondent,
reverse the order of the trial court denying the request

for posttermination visitation, and remand the case to the trial court for it to evaluate whether posttermination visitation would be "necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child . . . ." General Statutes § 46b-121 (b) (1).

The following additional procedural history is necessary to our review of this issue. During the termination of parental rights proceeding, the attorney for the child, on several occasions, attempted to introduce evidence that posttermination visitation would serve the welfare of the child. First, counsel for the child asked the petitioner's social worker assigned to the case if "continued contact would be harmful to [the child]," at which point counsel for the petitioner objected on the ground that the question called for speculation. The trial court sustained the objection. Next, counsel for the child asked if the social worker had had conversations with the foster mother indicating that she was willing to maintain contact with the biological mother and to accept the biological mother's phone calls. Counsel for the petitioner again objected as to the question's relevance. The trial court permitted the child's counsel to explain the relevance. Counsel stated, "Your Honor, I would argue that it's relevant in the court's consideration of any order of postadoption—posttermination or postadoption contact." The trial court then asked how it had any control over that and how it could legally do so, after which it sustained the objection of the petitioner's counsel.

Finally, during closing arguments, counsel for the child "ask[ed] [the] court to consider the issue of posttermination and postadoption contact, taking a child-centered approach that visitation is [the child's] right, not her foster parent's right, nor her birth parents' rights, via an open adoption agreement but that the court does have the authority to issue court orders in that regard." When pressed by the court for case law

supporting that position, counsel responded that "the court has equitable authority . . . to issue these orders." Counsel went on to state that, even though the "parents [were] not in a place to regain custody . . . a parent's unfitness does not necessarily signify [his or her] inability to play a positive role in [the] children's life; nor does it necessarily signify the absence of an emotional bond or attachment. Posttermination contact . . . with birth parents can enable children, and [the child], specifically, to feel connected to her past while also allowing . . . the removal of circumstances that brought us here . . . . Specifically, I would ask [the] court to consider awarding up to four visits per year, as well as cards and photos, between [the child] and her parents . . . as such continued contact . . . would be in her best interest to do so and to maintain that relationship." The court did not make a determination at that time but asked the parties to submit briefs on the issue.

After considering the briefs, the trial court issued a memorandum of decision on the request for visitation, holding "that an order mandating postadoption contact between the child and the biological mother will not be ordered under the present circumstances . . . ." The court listed three reasons for not ordering "postadoption contact . . . ." The court stated that "(1) there is no cooperative postadoption agreement between the parties, (2) the court has not determined whether postadoption contact is in the best interest of the child, and (3) there is no presumption that the child has contact with a biological parent whose parental rights were terminated, absent a cooperative postadoption agreement. See General Statutes § 17a-112 (b) through (f)." As part of its analysis, the court stated that it found that "no credible evidence was presented at the [termination of parental rights] trial which would indicate that continued contact with the biological mother is in the best interest of the child."

It is this last single sentence that the petitioner relies on in support of her argument that the trial court found that posttermination visitation would not be in the child's best interest. At most, however, we read that statement to warrant remand rather than affirmance. Under one interpretation, the statement is inconsistent with the trial court's previous statement in its memorandum of decision that "the court has not determined whether postadoption contact is in the best interest of the child . . . ." Inconsistent statements can warrant reversal of a trial court's order. *In re Pedro J. C.*, 154 Conn. App. 517, 531, 105 A.3d 943 (2014) ("[t]here are instances in which the trial court's orders warrant reversal because they are logically inconsistent rulings"), overruled in part on other grounds by *In re Henrry P. B.-P.*, 327 Conn. 312, 173 A.3d 928 (2017). This inconsistency, in addition to the trial court's misapprehension that § 17a-112 (b) through (f), rather than § 46b-121 (b) (1), governed the respondent's request, warrants a remand of the case to the trial court. Under another interpretation, the trial court's statements were not inconsistent in that the reason it found no credible evidence presented that posttermination visitation would be in the best interest of the child was because it did not believe it had the authority to admit or to consider posttermination visitation evidence. Either interpretation warrants remand.

Additionally, remand is appropriate in the present case because we are setting forth, for the first time, the standard and potential considerations for trial courts to consider when evaluating whether posttermination visitation should be ordered within the context of a termination proceeding. See *Cefaratti* v. *Aranow*, 321 Conn. 593, 625, 141 A.3d 752 (2016) (remanding case after adopting new standard to afford plaintiff opportunity to present evidence). We derive the standard for evaluating posttermination visitation from the authority

granted to trial courts under § 46b-121 (b) (1)—"the
Superior Court shall have authority to make and enforce
such orders . . . necessary or appropriate to secure
the welfare, protection, proper care and suitable sup-
port of a child . . . ." Even though, as explained, courts
have broad authority in juvenile matters, that broad
authority has been codified in § 46b-121 (b) (1), which
defines the contours of the courts' authority to issue
orders "necessary or appropriate to secure the welfare,
protection, proper care and suitable support of a child
. . . ." General Statutes § 46b-121 (b) (1). Although the
respondent in the present case contends that any post-
termination visitation should be evaluated on the basis
of the child's best interest, we conclude that the more
prudent approach when evaluating whether posttermi-
nation visitation should be ordered is to adhere to the
standard that the legislature expressly adopted—"nec-
essary or appropriate to secure the welfare, protection,
proper care and suitable support of [the] child . . . ."
General Statutes § 46b-121 (b) (1); see *Burkert* v. *Petrol
Plus of Naugatuck, Inc.*, 216 Conn. 65, 73, 579 A.2d 26
(1990) (concluding that General Statutes § 52-572n et
seq. limited common-law remedy for certain claims but
did not foreclose other claims).

Whether to order posttermination visitation is, of
course, a question of fact for the trial court, "which has
the parties before it and is in the best position to analyze
all of the factors which go into the ultimate conclusion
that [posttermination visitation is in the best interest
of the child]." (Internal quotation marks omitted.) *In
re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11,
14, 438 A.2d 801 (1981); see id. (concluding that trial
court's findings on abandonment supported conclu-
sion). Our dedicated trial court judges, who adjudicate
juvenile matters on a daily basis and must make deci-
sions that concern children's welfare, protection, care
and support, are best equipped to determine the factors

In re Ava W.

worthy of consideration in making this finding. As examples—which are neither exclusive nor all-inclusive— a trial court may want to consider the child's wishes, the birth parent's expressed interest, the frequency and quality of visitation between the child and birth parent prior to the termination of the parent's parental rights, the strength of the emotional bond between the child and the birth parent, any interference with present custodial arrangements, and any impact on the adoption prospects for the child. See *In re Adoption of Rico*, supra, 453 Mass. 754–55 (court explained circumstances in which order for posttermination visitation may be appropriate and warranted); see also A. Williams, Note, "Rethinking Social Severance: Post-Termination Contact Between Birth Parents and Children," 41 Conn. L. Rev. 609, 636 (2008) (listing factors to consider for posttermination visitation). Trial courts should, of course, evaluate those considerations independently from the termination of parental rights considerations.[18]

Finally, we note that trial courts maintain jurisdiction over proceedings concerning children committed to the

---

[18] To be clear, our holding and analysis in the present case are limited to the procedural posture by which the respondent sought posttermination visitation. Specifically, she requested posttermination visitation *during* a proceeding in which she was the respondent and the petitioner sought to terminate her parental rights. At that time, the trial court had the appropriate parties and evidence before it to consider her request as "necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child . . . ." General Statutes § 46b-121 (b) (1). We do not opine upon whether a trial court has authority to consider a request for posttermination visitation made *after* parental rights have been terminated. In that kind of case, we might be required to examine a variety of constitutional rights and statutory authority not implicated in the present case, namely, but not exclusively, whether the parent whose rights have been terminated has the right to pursue posttermination visitation and whether the trial court's authority to grant posttermination visitation has been abrogated by the visitation statute. See General Statutes § 46b-59 (b); see also *In re Andrew C.*, Docket No. H-12-CP11013647-A, 2011 WL 1886493, *11 (Conn. Super. April 19, 2011) (explaining that permitting parents whose rights have been terminated to file applications for visitation pursuant to § 46b-59 "could significantly impede what the law requires be an expeditious progress toward achieving permanency for a child").

care of the petitioner and possess the authority to issue appropriate orders. See General Statutes § 17a-112 (m) through (o). Subsection (m) permits the petitioner to "petition the Superior Court for revocation of a commitment of a child as to whom parental rights have been terminated . . . ." General Statutes § 17a-112 (m). Subsection (o) mandates that the Superior Court maintain involvement in a variety of ways after the termination of parental rights. See General Statutes § 17a-112 (o). For example, the court must receive reports from the statutory parent or guardian, and it may convene a permanency hearing and determine if the department has made reasonable efforts to place the child in an adoptive placement. See General Statutes § 17a-112 (o). Accordingly, posttermination visitation orders can be modified by the court "as necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child . . . ." General Statutes § 46b-121 (b) (1).

The order of the trial court denying the request by the minor child and the respondent mother for posttermination visitation is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion ROBINSON, C. J., and PALMER, McDONALD, KAHN and ECKER, Js., concurred.

MULLINS, J., concurring. I agree with the result. In the present case, it was the child who originally sought posttermination visitation. The child consistently requested posttermination visitation throughout the termination proceeding and joins the respondent's appeal, asserting that the trial court has authority to consider that request for posttermination visitation. For that reason, I agree with the majority that the court in the present case had the authority to consider posttermination visitation orders under General Statutes § 46b-121 (b) (1).

Accordingly, I concur in the majority opinion.